52 CCPA
**Application of Nicholas MOSTOVYCH, James J. Weber, Walter A. Mitchell, Jr. and Paul L. Aulbach.**

**Patent Appeal No. 7255.**

United States Court of Customs and Patent Appeals.

Dec. 17, 1964.

Hugo E. Weisberger, Washington, D. C., John F. C. Glenn, Glenn, Palmer & Matthews, Richmond, Va., for appellants.

Clarence W. Moore, Washington, D. C. (J. E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

MARTIN, Judge.

The issue in this appeal from the Board of Appeals is whether the claims to appellants' method of producing a black inorganic finish on anodized aluminum, and the articles produced thereby, define more than obvious variations of the prior art.

Appellants' application, serial No. 860,073 entitled "Method of Coloring Metal and Article Produced Thereby", filed December 17, 1959, is stated to be a continuation-in-part of application serial No. 702,509 filed December 13, 1957. Appellants have appealed claims 1 through 11 of the twelve claims refused by the board in the continuation case.

The invention relates to a three-step process for producing a black iron sulfide finish on anodized aluminum. The blackened aluminum is used primarily as architectural paneling. By anodized aluminum is meant aluminum or aluminum base alloys which have been subjected to an electrolytic treatment in a bath of an acid, such as sulfuric acid, whereby a thin film of what is termed aluminum oxide is produced on the surface of the metal. Beginning with such conventionally anodized aluminum sheet as the material to be processed, the steps of the claimed method are as follows:

1) The sheet is immersed in an aqueous solution of a ferric ammonium double salt, e. g., ferric ammonium oxalate, tartrate, or citrate. This solution acts to deposit iron oxide or hydroxide within the interstices of the aluminum oxide layer on the aluminum sheet, giving the surface a yellowish or brownish appearance.

2) The sheet is then treated with an aqueous solution of a weakly alkaline or non-alkaline sulfide-ion donor, e. g., hydrogen sulfide or ammonium hydrosulfide. This converts the iron oxide or hydroxide into black iron sulfide.

3) The blackened sheet is then sealed by treatment with an aqueous solution of a dichromate, e. g., potassium or sodium dichromate. This treatment reduces smutting caused in part by the formation of a powdery whitish film of excess free sulfur on the surface of the sheet. Sealing also raises the heat resistance, as compared to an unsealed surface, from 200° F. to about 400–500° F. The application describes the sealing step and sealing agents as follows:

"In accordance with this invention, it has been found that the difficulties arising from sulfur formation and smutting may be completely overcome by a third step comprising a sealing treatment. Conventional sealing agents may be employed for this purpose, including hot water at a temperature between about 80° C. and its boiling point, or solutions of halogenated paraffins, or aqueous solutions of metal salts having oxidizing properties, such as permanganates or dichromates. However, in the practice of the novel process of the present invention, it is preferred to employ as a sealing agent an aqueous solution of a soluble dichromate, such as ammonium [,] potassium, or sodium dichromate. This treatment greatly increases the abil-

ity of the black finish to withstand elevated temperatures. Thus, for example, whereas an iron sulfide type black finish without sealing treatment is capable of withstanding temperatures only up to about 200° F., the sealing step results in raising this limit to temperatures as high as 400° to 500° F."

Claims representative of the method and article are:

"2. The method of producing a black inorganic finish on an anodized aluminum article which comprises immersing the article in a solution of a reducible ferric-ammonium double salt, then treating the ariticle with a substantially nonalkaline sulfide-ion donor, and sealing the resulting iron sulfide coating, by immersing the article in an aqueous solution of a soluble dichromate.

"11. An anodized aluminum article carrying within the interstices of its anodic oxide film a black inorganic finish comprising particles of iron sulfide precipitated thereon by interaction of ferric-ammonium oxalate and hydrogen sulfide, said particles being sealed within [sic] a potassium dichromate after-treatment."

Claim 1 is breader than claim 2, not specifying the type of sealer, while the remaining claims are more specific as to the species of dichromate sealer, and to concentration, pH and temperature of the solutions employed.

The references applied are:

| Tosterud | 2,290,364 | July 21, 1942 |
| Balmas | 2,698,262 | Dec. 28, 1954 |
| Cunningham et al. | 2,785,098 | March 12, 1957 |

The Cunningham et al. patent is directed to a method of coloring anodized aluminum with metal *oxide* pigments deposited within the interstices or pores of the anodic aluminum oxide layer. The product coatings possess "improved resistance to corrosion and abrasion," and are "fast to light and water." The patented method also can be described as a three-step process. Starting with conventionally anodized aluminum, the first step comprises depositing a metal alcoholate in the anodic aluminum oxide layer by immersing the anodized plate in a solution of the alcoholate. As the second step, the metal alcoholate is hydrolyzed to the corresponding metal oxide. It is this oxide which functions as the pigment. Various oxide colors are obtained by choice of the appropriate metal alcoholate, "e. g. green from chromium oxides by hydrolysis of a chromium alcoholate, yellow, reds and even black from iron oxide by hydrolysis of the corresponding iron alcoholate, black from copper oxide, and white from the hydrolysis of calcium, magnesium, zirconium and many other alcoholates."

Cunningham et al. disclose an additional step, which is designated step 2A for convenience, to obtain colors other than those provided by oxide pigments if so desired. They state:

"For example, if the color desired in the coating is the color of the sulfide of a particular metal, then the oxide is deposited in the adsorbent layer from a suitable metal-organic compound as above described, and then exposed to a sulfiding agent such as gaseous hydrogen sulfide, either anhydrous or containing moisture or an ammonium sulfide solution, or a solution of another sulfide. In this manner white cadmium oxide may be converted to a bright yellow cadmium sulfide."

Their third step is that of sealing:

"The final step in the overall process comprises treating the aluminum or aluminum alloys to seal the anodized surface and thus seal the inorganic pigment inside this hard layer. The sealing may be effected by immersing the aluminum or aluminum alloy in hot water for about 15 minutes or by heating the coated aluminum in a moist atmosphere for between 5 and 30 minutes depending on the temperature."

Tosterud describes the precipitation of iron oxide as a pigment into the aluminum oxide layer of anodized aluminum.

The patent states that the prior art failed to provide satisfactory iron oxide colorants, "probably due to the fact that the common hydrolyzable salts of iron * * give a high hydrogen ion concentration." He further states that "efforts to adjust the hydrogen ion concentration of solutions of these salts with an alkaline material such as ammonium hydroxide invariably result in the precipitation of iron hydroxide from solution" before the iron oxide precipitates in the aluminum oxide layer. Tosterud solved the problem by precipitating iron oxide from aqueous solutions containing ferric oxalate. He uses ferric oxalate alone or "almost any combination of materials which will give a ferric oxalate solution." This is done preferably by:

"* * * the addition of soluble oxalates to solutions of the common ferric salts such as ferric chloride, ferric nitrate, and ferric sulfate. Soluble oxalates which are particularly suitable as additions to solutions of ferric chloride, ferric nitrate, and ferric sulfate are the soluble alkali metal oxalates including ammonium oxalate. The advantages of the present invention can apparently be obtained independently of the method used for obtaining the solution of ferric oxalate."

The soluble oxalate is used in a ratio of "about 1 to 3 mols" per mole of ferric salt.

The Balmas patent relates to a method of sealing anodic oxide layers on aluminum surfaces to improve their characteristics by treatment in a bath of a halogenated phenyl or polyphenyl compound. Balmas teaches his process to be an improvement over the prior art sealing processes. It is the Balmas discussion of the prior art in which we are interested:

"Sealing has been carried out commercially by immersing the anodized aluminum in water maintained between 80° C. and its boiling point.

* * * * * *

"* * * Further to improve corrosion resistance, the sealing bath has been modified by additions of chromic acid, or boric acid, or metal salts such as sodium dichronate [sic], zinc dichronate [sic], ammonium dichronate [sic], alone or in combination with organic acids, metal fluorides, metal borates and the like, or by the addition of nickel or cobalt sulfates and the like."

Although the examples in Balmas do not include a pigment deposited within the anodic aluminum oxide coating, both his own sealing treatment and the sealing treatments of the prior art apply to pigmented anodized aluminum since he states:

"The oxide coating may contain other modifying components depending upon the process used and the base metal upon which the oxide layer is formed. The introduction of oxide coatings on the surfaces of aluminum is intended to improve resistance to corrosion, resistance to abrasion, and absorption of coloring when treated with suitable tinctorial agents, such as organic dyes and inorganic pigments to provide permanent color in the surfaces of the aluminum."

After careful consideration of the references and appellants' arguments we find no error in the rejection of all the claims as unpatentable over Cunningham et al. in view of Tosterud and Balmas. We agree with the position of the examiner as stated by the board:[1]

"* * * The position of the Examiner appears to be that the replacement of the metal organic compound of Cunningham et al. with the mixed ferric-ammonium oxalate of Tosterud and the replacement of

1. The quotations of the board herein are taken from its decision in the parent case which involved the same claims as on appeal here. That decision was incorporated by reference into the decision in the appealed continuation case. Both decisions were rendered on the same date.

the hot water sealing step with the dichromate sealing step of Balmas would be obvious to a person of ordinary skill in the art."

From a comparison with Cunningham et al., it is evident that the reference discloses all the steps of the claimed method in the same order, i. e., production of a metal oxide (steps 1 and 2 of Cunningham et al. as outlined above), conversion to the sulfide pigment if so desired (step 2A of the patentees), and sealing the pigment in the aluminum oxide layer (step 3 of the patentees). Tosterud shows an alternative method of accomplishing the deposition of the iron oxide, while Balmas shows three distinct methods of sealing. We think that the claimed process and article produced thereby are no more than a selective combination of the prior art teachings, done in a manner obvious to one of ordinary skill in the art. In re Williams, 223 F.2d 291, 42 CCPA 988. Each of the steps of the claimed process appears to be relatively complete in itself. There is no indication of an interaction between the steps of such a type that would lead one of ordinary skill in the art to doubt that a substitution of alternative steps known to the art could be made.

Concerning what we consider to be appellants' major contention, the board stated:

"Appellants contend that Tosterud does not disclose the use of the double salt, ferric-ammonium sulfate [sic] but only discloses a mixture of the respective ferric and ammonium salts and that the use of a double salt appears to make a specific difference in the over-all efficiency of the iron oxide coating step resulting in a reduction of the time of treatment. We are not persuaded by this argument. We agree with the Examiner that when a solution has been made of the salts, the time of treatment should be the same as if the solution had been made of the double salt. In any event, we have no evidence in the record before us which controverts the Examiner's position."

Appellants' specification does not disclose in what way the ferric ammonium oxalate double salt[2] solution is prepared. Assuming appellants' solution to be prepared by dissolving crystals of the double salt in water, it would then actually differ from the Tosterud mixture of the two single salt solutions of comparable molar proportions. Taking Tosterud's disclosed solutions of ferric chloride and ammonium oxalate for example, the resulting mixture contains chloride anions in place of some of the oxalate anions. Appellants assert the difference is "significant", since the use of the double salt allegedly results in a shorter dipping time being required in order to deposit the ferric oxide. But this shorter time is at best arguable since Tosterud points out that the "time of immersion in any given solution is dependent on the color desired." This corresponds closely to appellants' own teaching in their specification. We think, as evidently the board did, that there is no evidence of any *effective* difference between a solution of the ferric ammonium oxalate double salt, and a 3:1 to 1:1 mixture of solutions of ammonium oxalate and a ferric salt, as disclosed by Tosterud. An arguable difference is not convincing at the precise point where comparative evidence is clearly needed.

Appellants submitted an affidavit by one Hafer, indicating that an attempt to obtain iron alcoholates from several suppliers, including the assignee of the Cunningham et al. reference, was unsuccessful. We do not see that an inability to obtain alcoholates is material to the rejection because it does not speak to any difference between appellants' double salt solution and Tosterud's mixture.

2. Hackh's Chemical Dictionary, 3rd Ed. (1950) at p. 287, defines a double salt as

"A compound which crystallizes as a single substance but which, on dissolving, ionizes as two substances; e. g.,

$$K\ Al(SO_4)_2 \longrightarrow K^+ + Al^{+++} + 2SO_4^{--}."$$

Appellants' characterization of their products as having "high" heat resistance and absence of smutting is ineffective to show unobviousness. The improvement in these two properties is asserted on the basis of comparison with a product having an *unsealed* surface. A comparison with an *unsealed* surface is not significant since the prior art, as shown by Balmas and Cunningham et al. clearly indicates that sealing is both beneficial and conventional. We have no evidence on which any real difference can be predicated.

Contrary to appellants' contention, Balmas can be said to contemplate the sealing of a *pigment-containing* anodic layer. That the specific reference to sealing with dichromate is found only in Balmas' discussion of the prior art is immaterial to its significance for reference purposes.

The examiner and board apparently considered the values of time, pH, temperature and concentration recited in several claims to be no more than those which would be determined by one of ordinary skill in the art in achieving the optimum operation of the process. Finding no evidence for a holding to the contrary, we agree with that view. We note that the ranges of pH, time and temperature for the iron oxide deposition step of Tosterud overlap appellants' ranges for that step. Further, while the use in appellants' specification of the phrases "preferable", "advantageously", and "as desired" to describe such values are not controlling evidence of non-criticality, the specification presents no critical value or relationship whatever, much less one conclusive of unobviousness.

Appellants cite In re Murray et al., 268 F.2d 226, 46 CCPA 905 to support the point that the court should view the prior art "without reading into that art the teachings of appellant's invention". He also cites In re Sporck, 301 F.2d 686, 49 CCPA 1039, and In re Osplack, 195 F.2d 921, 39 CCPA 932, to support the view that simplicity of the invention should not bar patentability nor should a holding of obviousness be based on hindsight. In re Rothermel et al., 276 F.2d 393, 47 CCPA 866, is cited as cautioning against a piecemeal reconstruction of the prior art teachings, while In re Irmscher, 262 F.2d 85, 46 CCPA 761, and In re Wynne et al., 255 F.2d 956, 45 CCPA 1018 are relied on as requiring a fair suggestion of the combination. The manner in which the references are combined here is consistent with the principles of those cases; considering the art as a whole we find without doubt a fair suggestion of the claimed invention, and no unobvious results to persuade us otherwise.

For the foregoing reasons the decision of the board is affirmed.

Affirmed.