54 CCPA

**Application of Fred FORTESS and Werner A. P. Schoeneberg.**

**Patent Appeal No. 7578.**

United States Court of Customs and Patent Appeals.

Dec. 19, 1966.

---

Marvin Turken, for appellants.

Joseph Schimmel, Washington, D. C., for Commissioner of Patents.

Before RICH, Acting Chief Judge, MARTIN, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

ALMOND, Judge.

This is an appeal from the decision of the Board of Patent Appeals affirming the rejection of process claims 1–7, 9–14 and 21, and product claims 17–20 in appellants' application serial No. 680,783, filed August 28, 1957 for "Anti-Staticized Cellulose Esters."[1] No claims were allowed by the examiner.

The invention relates to a process of producing surface-saponified, heat-treated filamentary material of cellulose esters, such as a cellulose triacetate fabric, and the products resulting therefrom.

The saponification is effected by the use of an aqueous solution of an inorganic alkali such as NaOH, and the result is a filament having a core of the original cellulose triacetate surrounded by a thin skin of regenerated cellulose. The saponification step can be carried out at a temperature ranging from about room temperature to the boiling point of the solution. The concentration of alkali can range from 25% to as little as 0.2% by weight. The duration of treatment can vary from as little as 15 seconds to as much as 90 minutes.

The heat treatment step may be carried out under the same conditions as are used for unsaponified triacetate material, and heat may be supplied by contact with hot air, steam, hot oil, molten metal, infra-red radiation, or high frequency electric field. The temperature will vary with the heat treating medium used, with optimum results being obtained at about 230° C. The material may be treated in the relaxed condition or while held under tension.

In addition to those two principal steps, a bleaching operation may precede the saponification step. Odors normally imparted by the bleaching agent, e.g. peracetic acid, are eliminated by the saponification alkali which serves to neutralize any residual bleaching agent. Although previously colored cellulose triacetate may be used, the fabric is generally dyed after the saponification step, with dyes of the well-known dispersed cellulose acetate type being preferred. The surface saponified material of the invention is disclosed to take up such dyes at substantially the same rate as the starting material before saponification. The "preferred" sequence of operation is surface saponification, coloring and heat treatment, although one may start with a heat-treated triester fiber.

The treated materials are disclosed to:

* * * exhibit permanent anti-static properties, a better hand, improved resistance to abrasion, better wettability by aqueous liquids such as printing pastes, freedom from odor, resistance to spotting and plasticizing, and the ability to be ironed at relatively high temperatures without damage.

Although the materials against which the above quoted improvements are observed is not explicitly stated, the subse-

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. The application is stated to be "in part a continuation of our copending application Ser. No. 498,113, filed March 30, 1955."

quent paragraph further discloses that in the dyed condition the treated materials "exhibit better resistance to ozone-fading and gas-fading as compared with the usual filamentary materials made up of cellulose esters of low hydroxyl content," i.e., triesters.

The saponification decreases the tendency to stick to the hot iron and raises the safe ironing point temperature to about 220–230° C. from an original unsaponified and not heat-treated value of not above 190° C. The heat treatment raises the safe ironing temperature still further to about 240–250° C.

The heat treatment increases the degree of crystallinity, and the crystalline order index, a measure of the size and perfection of the crystallites, and also improves the glazing resistance and shrinkage on pressing with moist steam as compared to a non-heat treated or uncrystallized triacetate fiber. The core of the heat treated materials have a crystallinity and index substantially the same as a solid triacetate fiber that has been heat treated to have a safe ironing point about between 210–240° C. The improvement in the above-noted properties and in the safe ironing point are correlated with the increase in the crystalline order index.

Representative claims read:

21. Process for the treatment of textile material, which comprises saponifying the fiber surfaces of a textile material comprising fibers of a cellulose lower fatty acid ester containing at most 0.12 alcoholic hydroxyl groups per anhydroglucose unit in the cellulose molecule thereof, with substantial-ly the entire balance of the cellulose hydroxyl groups esterified with the lower fatty acid radicals while leaving the fiber interiors intact, and treating the textile material to increase the crystallinity and crystalline order index of said intact fiber interiors.

17. Filamentary material comprising a core of cellulose acetate having an acetyl value of at least 61% by weight, calculated as acetic acid, surrounded by a substantially uniform integral skin of regenerated cellulose, ranging in thickness from about 0.05 to 0.3 microns.

19. Filamentary material comprising a plurality of filaments each ranging in denier from 2 to 6, each filament comprising a core of cellulose acetate of at least 61.5% acetyl value, surrounded by a substantially uniform integral skin of regenerated cellulose, the thickness said skin being such that the average acetyl value of each filament ranges from 58.5 to 61% by weight, calculated as acetic acid.

20. Filamentary material comprising a core of cellulose acetate having an acetyl value of at least about 61.5% by weight calculated as acetic acid and a safe ironing point of at least 230° C., surrounded by an integral skin of regenerated cellulose.

Claim 21 broadly calls for a "treatment" rather than a heat treatment step since it is disclosed that effects similar thereto may be achieved by the use of known swelling agents. The thickness of the regenerated cellulose outer skin is alternatively defined in claim 19 as an average acetyl value [2] of the whole filament

---

2. Appellants brief states that it is understood in this art that the cellulose triacetate contains an average of 0.12 cellulosic or alcoholic hydroxyl group per anhydroglucose unit, that is, at most a single hydroxyl per about 8 anhydroglucose units. Their brief then defines "acetyl value" as follows:

Another method which is well-understood in the art of defining cellulose triacetate is that it is a cellulose acetate having an acetyl value (abbreviated A.V.) of at least 59% calculated as combined acetic acid. This merely means that if a sample of cellulose triacetate is treated to remove all its acetate groups and convert them to acetic acid, the weight of such acetic acid will be at least 59% of the weight of the original cellulose triacetate sample. The theoretical acetyl value of completely esterified cellulose triacetate, i.e. which contains absolutely no cellulosic hydroxyl groups, is 62.5%. Thus, a cellulose triacetate having an acetyl value somewhere lower than 62.5% does

as compared to the core value of at least 61.5%. Claim 20 is said to be drawn to the product as heat treated by reference to the safe ironing point value of the core. The remaining claims refer in more detail to the coloring step or colored product, to the bleaching step, or to the alkalinity values.

The Patent Office rejected all the claims as obvious variations, 35 U.S.C. § 103, of the following references:

| | | |
|---|---|---|
| Briggs | 1,425,364 | Aug. 8, 1922 |
| McKee et al. (McKee) | 1,767,543 | June 24, 1930 |
| Dreyfus et al. [I] | 1,884,623 | Oct. 25, 1932 |
| Dreyfus [II] | 2,366,241 | Jan. 2, 1945 |
| Finlayson et al. [Finlayson] | 2,862,785 | Dec. 2, 1958 |
| Mork (British) | 20,672 | Feb. 9, 1911 |
| British Celanese (British) | 304,596 | Jan. 21, 1928 |

High Polymers, Volume 5, Emil Ott, Cellulose and Cellulose Derivatives, 230 (1956).

Work, 19 Textile Research Journal, 383, 385 (1949).

———◆———

All the claims were rejected primarily "over British Celanese taken with Finlayson in view of Briggs and Dreyfus II." British Celanese and Dreyfus I were relied on as teaching that surface saponification of "cellulose acetate" raises the safe ironing temperature and enhances dyeing properties. Finlayson discloses heat treating triacetate fibers. Mork is incorporated by reference in Briggs' background discussion of art prior to his invention, and relates to surface saponification of triacetate fibers. McKee was relied on only in connection with claims 3 and 13 calling for the bleaching step. McKee discloses bleaching cellulose ester fibers, including three made by the "cellulose acetate process," with "acetic peracid" (peracetic acid).

The Textile Research Journal article by Work was called to the examiner's attention by appellants for the following point, all emphasis being added by us:

*Cellulose Acetate Yarn*

Although cellulose triacetate is not a textile material, it is always an intermediate in the manufacture of *the commercial grade of cellulose acetate, commonly known as secondary cellulose acetate.* This last is secured by hydrolyzing off the anhydroglucose ring some of the acetyl groups so that the average number of acetyls per anhydroglucose ring is less than 3 but more than 2, with the remaining groups (equal in number to the difference between the number of acetyls and 3) being hydroxyl groups, as in the original cellulose. * * *

That portion of Work was referred to by appellants as support for the view that what the art terms "cellulose acetate" is secondary cellulose acetate, not the triacetate with which appellants deal. Appellants' brief explains:

A very important product of commerce in the fiber and textile arts is what is known technically as "secondary cellulose acetate", or "secondary acetate". Less technically this material is often referred to simply as "cellulose acetate" or simply as "acetate", often with no reference to its acetyl value or number of hydroxyl groups. In this material, while most of the cellulosic hydroxyl groups are replaced by acetate groups, there are

contain a very few cellulosic hydroxyl groups but, in general, no more than 0.12 such hydroxyl group per modified anhydroglucose unit, as stated above.

a substantially greater number of cellulosic hydroxyl groups remaining in the cellulose acetate than is the case with cellulose triacetate. Thus, a typical secondary cellulose acetate contains an average of 0.5 hydroxyl group per modified anhydroglucose unit and has an acetyl value calculated as combined acetic acid of about 54.5%. It is to be reiterated that the unmodified terms "cellulose acetate" and "acetate" refer to secondary cellulose acetate; while *cellulose triacetate is sometimes referred to as "cellulose acetate"*, the latter term is always used in this case together with a statement further defining the material such as maximum number of hydroxyl groups, e.g., 0.12 per modified anhydroglucose unit or minimum acetyl value, e.g., no lower than 59% and preferably no lower than 61% or 61.5%. [Emphasis added.]

It is our view that the passage from Work is not conclusive that the art of record here insofar as it refers to "cellulose acetate," means *only* secondary cellulose acetate, and thus is not pertinent to the rejection of claims drawn to triesters. First, the passage quoted does not purport to establish that at the date of the references, "cellulose acetate" meant only secondary cellulose acetate. Nor does it purport to establish that one of ordinary skill at the time of the instant invention would consider that all prior references were thus referring to secondary acetate. It does establish that what is known as "the commercial grade

of cellulose acetate" is now commonly known as secondary cellulose acetate. Further, the Briggs reference uses the term "cellulose acetate" in a manner that we consider to be inconsistent with appellants' contention, that it universally meant secondary cellulose acetate. Briggs, for instance, appears to use the term more generically:

> This invention relates to the treatment of filaments, threads or fabrics of or containing cellulose acetate, having a lower degree of acetylation than triacetate, with the object of rendering them amenable to dyeing, and to the dyeing of such filaments, threads or fabrics.

A second passage of Work shows the significance of whether or not a given reference relates to secondary acetate:

> * * * Furthermore, it is impossible to produce an appreciably increased amount of short-order regularity [in secondary cellulose acetate] by an annealing operation, such as is the case with cellulose triacetate. * * *[3]

Since secondary acetate is not crystallizable, at least by heat treatment, a reference dealing therewith could not be combined with a reference relating to heat treatment of the triacetate to show the claimed process and product were obvious. Thus, with appellants' point about "cellulose acetate" in mind we must consider the references only for what they clearly and fairly teach.

Dreyfus II refers to its "cellulose acetate yarn" as having an acetyl value of

---

3. Although the Ott reference was relied on at p. 230 for a different point that we need not consider here, appellants ask us to take judicial notice of another passage in the same reference at p. 342 that tends to confirm the crystalizability point of Work:

> * * * Thus, cellulose acetate rayon in which the D.S. is about 2.5 usually exhibits low crystalline order, and no practical method of controlling the order in various products as in the case of viscose rayon is known. * * *

We note still another passage from Ott at p. 344 that puts the above in proper context:

> * * * The secondary cellulose acetates of commerce are generally not very crystalline and *cannot be readily crystallized by heat* below the softening point. However, crystallization *occurs readily* at temperatures of the order of 100° to 150° C. *in the presence of limited swelling reagents* such as diacetone alcohol, * * * 5% dioxane in water, * * * methanol, * * * or water vapor. [Emphasis added.]

It will be recalled that such treatments other than heat are contemplated as part of the claimed invention herein.

53.2%, which is, as appellants observe, a figure somewhat low even for secondary acetate. That being conclusive of Dreyfus II as relating to secondary acetate, we find its teachings not relevant to the rejection, and we will not further consider it. The earlier Dreyfus I reference is somewhat more ambiguous. It states, in pertinent part:

> An object of our invention is to increase the safe ironing point of textile materials containing organic esters of cellulose by the partial saponification of the same on the surfaces of the fibres thereof only. Other objects of our invention will appear from the following detailed description.
>
> \* \* \* \* \* \*
>
> We have found that if textile materials containing organic esters of cellulose are treated with a limited quantity of an alkaline solution, and the same is quickly heated, intense saponification on the surface of the fibres of a material takes place, whereby the safe ironing point is raised and the textile material may dye evenly.
>
> \* \* \* \* \* \*
>
> The fabric treated by our invention is made of fibres of cellulose esters which is intensely saponified on the surface of the fibres. By this is meant that only the outer skin or layer of the fibre is saponified to substantially completely reconstituted cellulose, while the interior of the fibre consists of practically unaffected organic ester of cellulose. This is indicated by the fact that if a textile material comprising yarns of acetone

soluble cellulose acetate is treated by our invention so that it suffers a loss of weight of say 6% by the saponification, the resultant product is almost completely soluble in acetone, whereas a cellulose acetate of corresponding acetyl value [4] which is not saponified on the surface is not soluble in acetone. \* \* \* Thus when a cellulose acetate fabric having a safe ironing point of 220° C. is treated by our process, its safe ironing point is raised to 260° C., 290° C. or more.

In view of appellants' statements that a triacetate would have a safe ironing point of more nearly 180–190° C., and a secondary acetate is acetone soluble while the triacetate is not, Dreyfus II appears to be fairly construed as more relevant to secondary acetates than triacetates or generic to both.

Although keeping in mind the technical deficiencies in those references, we do view them as teaching something about surface saponification in general, and resultant improvement in the safe ironing temperature and resistance to acid fading properties of the given fibers. Similarly, we consider the British Celanese reference in referring to "cellulose acetate" does have pertinence in what it teaches about superficial saponification in general:

> It has been found that when a material containing cellulose acetate or other organic ester of cellulose is saponified, the safe ironing temperature is progressively raised with increase in the degree of saponification. Thus, for example, if cellulose acetate ma-

4. We take "a cellulose acetate of corresponding acetyl value" to mean corresponding to the saponified product, else the quotation would appear to make more sense if the first reference to "acetone soluble" were to read acetone *in*soluble. The ambiguity is not clarified even taking the reference to be referring to secondary acetate, since its disclosure of "an outer skin" of "completely reconstituted cellulose" we are told by appellants' specification is "irregular and not controllable":

By way of comparison, if a cellulose acetate of intermediate acetyl value is similarly treated its free hydroxyl groups render it hydrophilic throughout its cross section so that saponification partly de-acetylates the core as well. Any surface saponification which simultaneously occurs is irregular and not controllable. It is more difficult if not impossible to produce a skin of pre-determined thickness and it is always possible that saponification will proceed so far that the fiber will essentially become regenerated cellulose rather than cellulose acetate.

terial is saponified to an extent corresponding to a loss in weight of 1% of the cellulose acetate it may be safely ironed at 230° C., while saponification corresponding to a 3% loss in weight raises the ironing point to 250° C. With a saponification corresponding to a 5–6% loss in weight the ironing temperature is raised to about 260° C. The saponification may be carried to a degree corresponding to a loss in weight of 10% or even more if desired, but it is obviously of no advantage to raise the safe ironing temperature above 260° C., since cotton itself scorches at this temperature and in fact the cellulose of the cellulose acetate also begins to scorch irrespective of any melting of the cellulose acetate.

From our review of the board's position it seems clear that the above references were relied on for such general teachings, particularly since the following references of record do explicitly relate to the triacetate, and form the primary and most relevant combination of references.

■ Although Briggs is also drawn to a "superficial alkaline saponification" treatment for a secondary cellulose acetate, Briggs refers specifically to prior art [5] concerning the triacetate:

The saponification of triacetates of cellulose to remove acetyl groups by treatment with saponifying agents, e. g. heating with alkaline solutions, is generally known, see for instance Cross and Bevan, "Researches on cellulose" 11 (1906) page 11.

＊　＊　＊　＊　＊　＊

＊ ＊ ＊ So far as triacetates are concerned, it has been proposed (see for example British Patent 20672 of 1910 [Mork]) to partially saponify the cellulose acetate in threads, fabrics or materials made therewith, in order to render them more amenable to dyeing.

That reference to a British patent is recognized as the Mork reference. Briggs confirms the improved dyeability

with all types of dyes on "surface-saponified" secondary cellulose acetates, while the strength, dry or wet and other valuable properties of the original cellulose acetate is retained. Briggs may perform saponification and also dyeing either consecutively or in one operation.

Mork "relates to a process for obtaining the lower acetates of cellulose from the higher acetates more particularly for the production of sheets of filaments." Mork may use either NaOH or ammonia, and notes that the process does not result in the di-or monoacetate but that the *amount* of acetate groups left in the cellulose acetate is the same quantity as in the di-or monoacetate. Mork states further that "it is not the purpose of my process to produce a definite chemical compound however, but merely to carry on a partial saponification."

Clearly, "partial saponification" would mean two things: A part being completely saponified, and the remainder untouched, or removal of only some of the acetate groups either throughout or in a part. Mork appears to disclose both possibilities:

For instance, the back of a photograph film base may be composed of the triacetate and the surface or a pattern on the surface only composed of the lower acetate, *or threads may have an interior of the triacetate and an exterior of the lower acetate,* or a *part* of a film may be changed to the lower acetate from front to back, leaving the remainder unchanged. In short, many combinations of this nature may be produced readily involving my invention. [Emphasis added.]

While "lower acetate" is not cellulose as in appellants' product, Mork states further:

Of course, when it is desired that the triacetate be entirely changed, it is only necessary to continue the saponification to that point.

For many purposes it is not harmful if the reaction continues so long that

---

5. The prior art thus referred to may be used for what it fairly teaches. In re Most-

ovych, 339 F.2d 455, 52 CCPA 884. See In re Boe, 355 F.2d 961, 53 CCPA 1079.

the film is *superficially* saponified until the acid groups have been *completely* removed.  [Emphasis added.]

Further, Mork's procedure involving the use of NaOH falls within what is disclosed by appellants as exemplary of the saponification step of the claimed process; Mork states:

> Superficial saponification is readily effected by subjecting the portion it is desired to change from the triacetate to a strong hot caustic soda solution or other active alkaline saponifying agent for a very short time, as for instance, a 10% sodium hydroxide solution for one or two minutes at 60° or 70° C.

> The saponification will proceed further the longer the reaction is permitted to continue.

As a result of Mork's "superficial saponification":

> Another advantage of the exercise of my invention is the fact that even if the original cellulose triacetate is very flexible and strong, the flexibility and strength are noticeably increased by subjecting the triacetate to partial saponification.

Finlayson discloses a heat treatment of cellulose triacetate either wet or dry spun, of an acetyl value of 60.0–62.5%, to a temperature below the thermal softening point.  The heat treatment results in an increased degree of crystallinity, and raises the sticking temperature.  The safe ironing temperature is raised from about 170°–180° C. to at least 200° C. and in many cases 230°–240° C.  It is also disclosed that the triacetate material may contain pigments, dyes or other effect material.  The heat may be applied as hot air, molten Wood's metal, hot water, and wet steam.  The tenacity in general remains unchanged.

Finally, the examiner relied on the Ott text at p. 230 for the following teaching regarding properties (footnote omitted):

> * * * According to Mark, the physical properties—tenacity, elasticity, etc.—are functionally related to the amount of crystalline material, while

the reactivity of the fiber—swelling, drying, ease of chemical reactions, etc. —is to be associated with the amorphous parts. * * *

During prosecution, appellants submitted an affidavit of Fortess, which they summarize as follows:

> A host of examples are presented in the Affidavit, some showing that even a mild saponification produces almost maximum properties in certain regards.  Thus Example A4 on page 3 shows the breaking point to be at a maximum at about 58.4 overall a.v. The wet flex abrasion of the filling of the fabric tested in Example B on page 4 is at a maximum at 58.0% a.v. at the top of the page and both warp and filling wet flex abrasion at 60° C. are very close to their maximum values at 58.0% a.v.  In the example at the top of page 5 the breaking point and elongation of the warp are at a maximum at 59.9% a.v.  The Table on the bottom of page 5 shows that maximum physical properties are produced by a reduction in a.v. of as little as 0.5%.  The last Table on page 8 shows that the maximum dyeability is achieved at an a.v. of 58.1%.

> Even when the maximum benefit is not achieved by a small degree of deacetylation, usually even this small degree will produce the greatest proportion of the benefit.  Thus in Example A1 on page 2 it is shown that a 2.6% reduction in a.v. produces a 27% increase in flex abrasion resistance while a further 9% reduction in a.v. does not produce a corresponding improvement in flex abrasion resistance.  Example A3 on page 3 shows the first few percent of deacetylation to produce the overwhelming proportion of improvement in moisture regain.  This applies also to the percent elongation at the bottom of page 3 and to the wet flex abrasion at 25° C. for the warp at the top of page 4 and both the warp and filling at 60° C. near the bottom of page 4.  The electrical tests in the middle of page 5 also bear out this contention.

We note here that the affidavit starts with triacetate yarn of 61.0 a.v. and reports the saponification results in terms of *overall* a.v., but does not give any evidence on the thickness of the regenerated cellulose skin.

■ From the above review we conclude that there is no reversible error in the board's affirmance of the rejection. As noted above the most pertinent references appear to be Briggs and Mork with regard to surface saponification of the triacetate, and Finlayson with regard to the heat treatment.

The main thrust of appellants' argument is that the Mork and Finlayson references, in being each confined to a separate step of the two-step process, do not render the combined process or product thereof obvious. Appellants note a lack in each reference of a suggestion of a combination with the other reference. We shall consider that argument with regard to the product and process separately.

Regarding the process, we think it an obvious combination of two processing steps, each lending to the end products the desirable properties each is known to produce when practiced alone. We fail to find evidence of record of a coaction between the steps that produces unexpected results. In re Williams, 223 F.2d 291, 42 CCPA 988, In re Mostovych, 339 F.2d 455, 52 CCPA 884. In such a case it is our view that one of ordinary skill in this art, having the references before him, would perceive the benefits of heat treating a superficially saponified triacetate fiber, or to saponify a heat treated triacetate fiber, without recourse to appellants' specification. No other combination of the references can be made. See In re Shannon, 356 F.2d 548, 53 CCPA 903. The same would be true with regard to the optional and conventional steps of dyeing and bleaching (McKee), on neither of which steps appellants place significant reliance for patentability.

It is also clear that the step of saponification of the triacetate was considered by appellants to be the significant step, the specification indicating that the heat treatment step was only a "preferred" step with which the saponification step could be combined. Although we grant there is no specific suggestion in either reference to combine it with the other step, we do not think it required in the circumstances of this case where both steps are taught to be part of the standard fund of modifications in the art, and the two steps do not coact in some mutually dependent way. The independence of the steps is evidenced, too, by the fact that they may be performed in any sequence, and that change in the control parameters of one does not appear to call for a critical change in any of those of the other—each is relatively separate and independent. The resultant properties appear clearly the sum of each step as acknowledged by the specification:

* * * The saponification of the surface of the material decreases its tendency to stick to the hot iron and raises its safe ironing temperature to about 220 to 230° C. Above these temperatures the material tends to stiffen and become boardy unless it has been heat treated. The heat treatment raises the safe ironing temperature *still further,* e.g. to about 240 to 250° C. [Emphasis added.]

Regarding the products, we view claims 17–19 to be drawn to the products of a saponification step alone. While appellants argue technical differences over the product of Mork, particularly the thickness of the skin and the antistatic properties, we think the product to be obvious in view of Mork. Differences in internal structure, if any, over that of Mork have remained a subject of argument. In this connection appellants state about Mork:

It is obvious from the overall disclosure of Mork that he does not teach a filamentary product wherein the filaments are composed of a core of substantially unmodified cellulose triacetate surrounded *and sharply divided from* a thin skin of regenerated cellulose, *although this product may in-*

*herently be obtained as a result of Mork's process.* \* \* \* [Latter emphasis added.]

As we noted in a similar situation, an arguable difference where comparative evidence is clearly needed is not convincing. In re Mostovych, supra.

Manifestly, from Mork and Briggs, appellants are not the first to surface saponify a cellulose triester filament. As taught by Mork, improved dyeability is expected and achieved. Appellants do not argue that the effect of raising the safe ironing temperature is unexpected. While that property is not specifically taught with regard to a cellulose triacetate, the British Celanese reference is pertinent as showing the effect of surface saponification in general to result in improvement of that value. British Celanese notes that the maximum increase to be expected cannot exceed pure cellulose or an entirely regenerated fiber. Regarding the anti-static property, the examiner has commented, without challenge, that the property is entirely expected. Moreover, we think it generally known that there is an absence of static in cotton, the presence thereof on acetates, and that static electricity is a surface phenomenon.

We agree with appellants that claim 20 is drawn to a heat or swelling agent treated *and* surface saponified fiber since the *core* is stated to have a safe ironing temperature above 230° C. However, the product so defined is no less obvious in view of what one of ordinary skill would expect as taught by Mork and Finlayson.

Regarding the affidavit, it does not, in our view, purport to show criticality in the surface thickness of the regenerated cellulose. No thicknesses are reported therein. Rather, it shows that a surface saponification *maximizes* certain desirable properties, and further or homogenous saponification will reduce those properties. As the board stated:

\* \* \* The surface saponification of cellulose triacetate being known and

the properties of regenerated cellulose layers being appreciated, we do not see the fact that the surface saponification gives improved results is more than a confirmation of the reasonable expectations of the art or an explanation of the advantages of a prior-art process and product.

Appellants have not convinced us of reversible error in that view.

We consider the remainder of appellants' arguments to be less significant than those here treated and not convincing of a different result. For the reasons given, the decision of the board is affirmed.

Affirmed.

SMITH, Judge, took no part in the decision of this case.

MARTIN, Judge, participated in the hearing of this case but died before a decision was reached.